UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF ILLINOIS

**FILED**

SEP 1 5 2013

CLIFFORD J. PROUD
U.S. MAGISTRATE JUDGE
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

**IN THE MATTER OF THE SEARCH OF THE PROPERTY LOCATED AT 108 HALSTED DRIVE, APT. 3, BELLEVILLE, ILLINOIS, FURTHER DESCRIBED AS A BLUE BLOCK, TWO STORY BUILDING, COVERED REAR PORCH, WITH THE NUMBER 108 CLEARLY MARKED ON THE SIDE OF BUILDING.**

Case No. _13-M-6043-CJP_

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Michael Rehg, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Drug Enforcement Administration, and have reason to believe that on the premises known as:

**The property located at 108 Halsted Drive, Apt. #3, Belleville, Illinois, further described as a blue block, two-story building, with covered back porch, with the number 108 clearly marked on side of building**

which is located within St. Clair County, in the Southern District of Illinois, there is now concealed certain property, namely

**See the attached list entitled "Attachment A, Items to be Seized,"**

which constitutes evidence of the commission of a criminal offense or which is contraband, fruits of the crime, or things otherwise criminally possessed, or which is designed or intended for use or which is or has been used as the means of an offense, in violation of Title 21, United States Code, Section 841(a)(1) and 846.  The facts to support the issuance of a Search Warrant are as follows:

2.      The affiant, Michael Rehg, is a Special Agent with the Drug Enforcement Administration (DEA) assigned to the Fairview Heights Resident Office.  The affiant has been a Special Agent with DEA since February of 1999.  From October 1989 until January 1999 the affiant was a Deputy United States Marshal (USMS) assigned to the East St. Louis, Illinois Office.  During the affiant's employment with the USMS, he was assigned to the DEA Task Force in Fairview Heights, Illinois for approximately four years.  During his tenure with DEA, the affiant has participated in numerous investigations involving the manufacture, transportation, and distribution of controlled substances.  These investigations have resulted in the seizure of controlled substances and proceeds from the sale of controlled substances, as well as arrests and convictions of drug traffickers.  The affiant is familiar with and has utilized normal methods of investigation, including but not limited to physical and electronic surveillance, questioning of witnesses, the use of search and arrest warrants, the use of informants, the use of pen registers, analysis of telephone records, the utilization of undercover agents, and the use of court-authorized wire intercepts.  The affiant has applied for and been granted numerous Precision Location Information orders similar to this order which have aided in identifying individuals, arresting fugitives, and seizing illegal drugs and drug proceeds.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and Confidential Sources (referred to as CS's). This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      This affidavit outlines the undersigned affiant's request for a search warrant at 108 Halsted Drive, Apt. #3, Belleville, Illinois (also referred to as **Target Premises**). Based upon the following facts, your affiant believes probable cause exists to search this location.

2

## PROBABLE CAUSE

5.      For the reasons set out in this affidavit, there is probable cause to believe that the TARGET OFFENSES have been committed, are being committed, and will continue to be committed by Daniel **Hernandez** and others known and unknown in this crystal methamphetamine Drug Trafficking Organization (DTO). Further, there is probable cause to believe that **Hernandez** is a crystal methamphetamine distributor. **Hernandez's** criminal history includes the following arrests; 2005 for possession of cannabis, 2006 receiving stolen property and burglary, 2008 Inflict of injury to spouse/cohabitant, 2009 possession of marijuana, 2010 probation violation, and 2012 DUI. It is believed that **Hernandez** resides at 108 Halsted Drive, Apt. #3, Belleville, Illinois (Target Premises) and also utilizes it as a "stash" house.

6.      On or about July 15, 2013, members of the Fairview Heights Resident Office (FHRO) recruited a DEA Confidential Source (CS#1) who provided information concerning a large crystal methamphetamine drug trafficking organization based in Los Angeles, California, that was being headed by Willie **Gonzalez** a.k.a. Bullet. CS#1 is facing criminal prosecution and is cooperating in hopes of future consideration from the government. CS#1 has provided substantial assistance in the past. Information provided by CS#1 has led to the seizure of pounds of crystal methamphetamine and the arrest of several subjects. It should be noted, during the time CS#1 was cooperating with DEA (St. Louis Division, Group 33), he/she became a target of an ongoing crystal methamphetamine investigation headed by the FHRO. During this investigation, CS#1 was eventually interviewed by agents from FHRO in the Southern District of Illinois. CS#1 was cooperative and turned over approximately 11 ounces of crystal methamphetamine to agents. CS#1 agreed to further cooperate with agents in the investigation of his/her current source of supply, Willie **Gonzalez**.

3

7.      According to CS#1, he/she had been obtaining crystal methamphetamine from **Gonzalez** for the past two (2) years.  CS#1 stated **Gonzalez** resided in Los Angeles, California and that he relied on Daniel **Hernandez** to assist in his drug dealings in the Metropolitan St. Louis area.  According to CS#1, **Hernandez** would make deliveries of methamphetamine for **Gonzalez** and pick up drug proceeds from local customers.  CS#1 believed that **Hernandez** resided in Illinois.  Agents have identified **Hernandez's** residence as 108 Halsted Drive, Apt. 3, Belleville, Illinois (the Target Premises).

8.      CS#1 told agents, he/she had obtained approximately 100 to 150 pounds of crystal methamphetamine from **Gonzalez** during the past few years.  CS#1 told agents that **Gonzalez** utilizes a Hispanic male known only as "**Kirby**" to transport the drugs from California to the Metropolitan St. Louis area.  Agents have since identified "Kirby" as Javier **Cisneros**.  CS#1 told agents that he/she has met **Cisneros** approximately 20 to 30 times during CS#1's involvement in the drug trade.  CS#1 told agents that **Cisneros** resides in California and his purpose in the organization is to transport drugs and money to and from California.  CS#1 stated that **Cisneros** utilized vehicles with hidden compartments to transport the drugs.  CS#1 said that **Cisneros** would typically deliver anywhere from 5 to 10 pounds of crystal methamphetamine to **Hernandez** in the St. Louis area.  **Hernandez** would be responsible for the distribution of the crystal methamphetamine in the St. Louis area.  CS#1 believed that he/she was **Hernandez's** best customer in the area.  **Hernandez** would provide CS#1 with multi-ounce or pound quantities of the drug at a time.  CS#1 stated the drugs were provided on consignment and he/she would pay **Hernandez** once it was sold.

9.      At the time CS#1's cooperation began with agents from the FHRO, CS#1 owed **Gonzalez** a large amount of money for past deliveries of crystal methamphetamine.  CS#1 stated

that **Gonzalez** and CS#1 disagreed on the amount of money that CS#1 owed **Gonzalez**.  CS#1 believed the drug debt to be approximately $20,000 and **Gonzalez** believed it was closer to $60,000.

10.     On July 25, 2013, agents instructed CS#1 to make recorded telephone calls to **Hernandez** and make arrangements to meet with him in St. Louis, Missouri. During these telephone calls it became clear that **Hernandez** was going to provide CS#1 with an unknown amount of crystal methamphetamine at the time of their next meeting.

11.     As a result, agents established surveillance of **Hernandez** at the Target Premises. Agents observed **Hernandez** depart the Target Premises on a motorcycle and drive straight to the meet location in St. Louis, MO to meet with CS#1.  **Hernandez** got into CS#1's vehicle and immediately pulled out a bag from inside the front of his pants to give to CS#1.  The bag contained approximately 11 ounces of crystal methamphetamine.  CS#1 also paid **Hernandez** $3,000 for CS#1's past drug debts.  **Hernandez** and CS#1 then began to talk about future dealings.  **Hernandez** indicated that he only had one (1) pound of crystal methamphetamine remaining.  He also told CS#1 that they hoped to put "**KIRBY**" on the road in the near future to transport another shipment of crystal methamphetamine to the Metropolitan St. Louis area. The above meeting was audio/video recorded by agents.   The video clearly showed **Hernandez** remove the crystal methamphetamine from inside his pants.

12.     On August 2, 2013, agents instructed CS#1 to make recorded telephone calls to **Hernandez** and make arrangements to meet with him in St. Louis, Missouri.  At approximately 1:32 p.m., CS#1 telephoned **Hernandez** and he answered the call and spoke to CS#1. **Hernandez** indicated that he would be leaving the Target Premises in approximately 20 minutes. CS#1 and **Hernandez** agreed to meet near Sundecker's Bar Grill on Laclede's Landing in

downtown St. Louis, Missouri.  This telephone call was recorded by agents.

13.     At approximately 1:48 p.m., SA Rehg and TFO Nord observed **Hernandez** arrive in the area operating a black Dodge Durango.  TFO Nord observed **Hernandez** park his vehicle and get into CS#1's vehicle.  CS#1 and **Hernandez** began to talk about the CS#1's drug debt. **Hernandez** indicated that the total cost of the last shipment of crystal methamphetamine they had received from **Gonzalez** was $96,000.   **Hernandez** also indicated CS#1 had paid approximately $77,000 in cash and cars towards the debt.  However, **Hernandez** indicated that CS#1 owed approximately $52,000 from past shipments.  **Hernandez** indicated to CS#1 that he had left his ledger at his house; along with the telephone he utilized to contact **Gonzalez**.  Agents believed that Hernandez was referring to the Target Premises.  **Hernandez** also said he still had a pound of crystal methamphetamine left.  This meeting was audio/video recorded by agents.

14.     Between the dates of August 2 and September 12, 2013, CS#1 has remained in contact with **Hernandez** regarding future deliveries of crystal methamphetamine.  During this time period, CS#1 was conversing with **Hernandez** and **Gonzalez** via telephone concerning his/her drug debt and future deliveries methamphetamine.  Several of these telephone conversations were recorded and were maintained as evidence.  The content of these calls indicated that **Gonzalez** was arranging another shipment of crystal methamphetamine to be delivered to **Hernandez** and CS#1 in the Metropolitan St. Louis area in the future.  Gonzalez also indicated during these conversations that he would be traveling to St. Louis to oversee the distribution of the drugs.

15.     On September 13, 2013, at approximately 3:40 p.m., CS#1 contacted SA Rehg and indicated that CS#1 had just been contacted by **Hernandez** via telephone (314)203-1581. According to CS#1, **Hernandez** indicated that the shipment of drugs had arrived and he wanted

to provide CS#1 with drugs as soon as possible.  CS#1 told **Hernandez** that he/she was out of town and could meet with **Hernandez** on the following day to obtain the drugs.  **Hernandez** further indicated that **Gonzalez** was in route to the Metropolitan St. Louis area to meet with them to oversee the distribution of drugs.  **Hernandez** indicated **Gonzalez** would arrive on Saturday evening (September 14) and asked CS#1 to obtain a hotel room in the area for **Gonzalez**.

16.     On September 14, 2013, at approximately 7:06 p.m., CS#1 telephoned **Hernandez** and asked if he would provide CS#1 with a half-pound of methamphetamine. **Hernandez** indicated he was going to call **Gonzalez** and ask if that would be okay.  **Hernandez** indicated that he would need approximately 30 minutes before he could meet with CS#1 to complete the transaction.  CS#1 indicated that he would need some additional time to complete the transaction.  This call was recorded by CS#1.

17.     At approximately 7:37 p.m., TFO Chad Nord observed **Hernandez** arrive at the Target Residence.  TFO Nord watched **Hernandez** retrieve something from the trunk and walk towards the back of the residence.  TFO Neal Rohlfing observed **Hernandez** enter the upstairs apartment, numbered 3, (the Target Premises).

18.     At approximately 7:44 p.m., TFO Rohlfing observed **Hernandez** exit apartment #3 and depart the Target Premises in his blue Impala.  Agents were unable to follow **Hernandez** at that time.

19.     At approximately 9:33 p.m., in the presence of agents, CS#1 telephoned **Hernandez** and they agreed to meet to complete the aforementioned drug transaction. Agents searched CS#1 and his/her vehicle for contraband.  This search was met with negative results. SA Rehg then provided CS#1 with electronic recording equipment and instructed him/her to meet with **Hernandez** to complete the drug transaction. A short time later, agents observed CS#1

meeting with **Hernandez** at the Mobile Gas Station located at I-70 and Broadway, St. Louis, MO.  **Hernandez** provided CS#1 with the approximately 8 ounces of crystal methamphetamine. **Hernandez** also told CS#1 that **Gonzalez** wanted to meet with CS#1 later in the evening. Hernandez indicated that CS#1 would need to pay **Gonzalez** some money before he obtained additional quantities of drugs.  CS#1 and **Hernandez** then departed the area.  CS#1 met with agents at a pre-arranged location.  SA Rehg and SA Box retrieved the electronic recording equipment and the crystal methamphetamine CS#1 had obtained from **Hernandez**.

20.     Based on the above information, it is believed that **Hernandez** is presently in possession of additional quantities of drugs at the target premises. Agents feel it is important to conduct the search warrant as soon as possible because **Hernandez** sells the majority of his drugs during the night.  Therefore, it is important to execute the search warrant before he can sell additional quantities from the target premises.

21.     Having been involved in numerous investigations, I have come to learn that people who are involved in buying and distributing narcotics regularly keep records of the amounts of the distributed narcotics, customer names that they are selling to and the amount of money that the customers owe for the narcotics.  I have observed that these records are kept at the same location where the transaction occurs.  In addition, I have been told by numerous defendants who have been involved in the delivery of narcotics and have observed myself on several occasions that scales and packaging material, including plastic bags, twisties and bread ties are usually kept in the same location with the narcotics.  I have observed that it is regular practice for individuals involved in selling illegal drugs, to keep additional quantities of those drugs and U.S. currency at the same location where the subject is conducting transactions.

22.     I submit this affidavit in support of search warrants for the location within the

jurisdiction of the reviewing Court. I have reviewed the description of this premise and believe it to be accurate, particularized descriptions of the premise to be searched.

23.     Based upon my and the investigating team's experience and our participation in investigations of other drug trafficking organizations involving large amounts of drugs, I Know:

a.     That drug traffickers very often place assets in names other than their own to avoid detection of theirs assets by government agencies:

b.     That even though these assets are in other persons' names, the drug dealers continue to use these assets and exercise dominion and control over them;

c.     That narcotics traffickers must maintain on hand large amounts of United States currency in order to maintain and finance their on-going narcotics business and often keep said currency in a residence;

d.     That drug traffickers maintain books, records, receipts, notes ledgers, airline tickets, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances;

e.     That drug traffickers commonly "front" (provide drugs on consignment) illegal drugs to their customers;

f.     That the aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the drug traffickers have ready access to them;

g.     That it is common for dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in a residence, among other places;

h.     That persons involved in drug trafficking conceal in their residences large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions, as well as evidence of

financial transactions relating to obtaining, transferring, secreting or spending of large sums of money made from engaging in narcotics trafficking activities;

i.      That when drug traffickers amass large proceeds from the sale of drugs that the drug traffickers attempt to legitimize these profits.  To accomplish these goals, drug traffickers utilize, including but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts;

j.      It is common for drug traffickers to travel to major distribution centers to purchase drugs and/or to arrange for their distribution elsewhere in the United States.  After purchasing drugs these traffickers will transport or cause to be transported, drugs to the areas in which they will distribute the drugs.  The methods of transportation include, but are not limited to, commercial airlines, private airlines, rental automobiles, private automobiles, and government and contract mail carriers.

k.      That drug traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers for their associates in the trafficking organization;

l.      That drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product and usually maintain these photographs in their possession;

m.      That drug traffickers usually keep near at hand paraphernalia for packaging, cutting, weighing, and distributing of drugs.  These paraphernalia include, but are not limited to scales, and plastic bags.

n.      That I am aware that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular trafficking in controlled substances.  Wherefore, your affiant believes Allen possesses evidence of conspiracy to distribute narcotics and money laundering thereto and seeks to search for the aforementioned evidence at:      108 Halsted Drive, Apt. #3, Belleville, Illinois (The Target Premises).

o.      That drug traffickers often use firearms, firearm ammunition, and other weapons in furtherance of their drug-related offenses.

p.      That drug organizations that utilize houses for the purpose of facilitating drug offenses commonly employ security systems/monitors/cameras and similar video devices to permit the offenders to conduct counter-surveillance to protect their drugs from robberies or to alert the offenders to the presence of the police to facilitate the destruction of evidence.

24.     Disclosure of the contents of the Application, Affidavit, and Search Warrant could compromise and jeopardize an ongoing investigation and witnesses who have provided information to the Drug Enforcement Administration.

FURTHER AFFIANT SAYETH NAUGHT.


_____
Michael Rehg, Special Agent


STEPHEN R. WIGGINGTON
United States Attorney


Donald Boyce
Assistant United States Attorney


Pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, the contents of this application and affidavit were submitted by reliable electronic means and sworn to under oath by telephone on September 15, 2013.


_____
CLIFFORD J. PROUD
United States Magistrate Judge

12

FURTHER AFFIANT SAYETH NAUGHT.


_____
Michael Rehg, Special Agent


STEPHEN R. WIGGINGTON
United States Attorney


Donald Boyce
Assistant United States Attorney


Pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, the contents of this application and affidavit were submitted by reliable electronic means and sworn to under oath by telephone on September 15, 2013.


CLIFFORD J. PROUD
United States Magistrate Judge

**ATTACHMENT A**

**Items to be Seized**

1.   Controlled substances, including crystal methamphetamine;

2.   Paraphernalia for packaging, cutting, weighing and distributing controlled substances, including, but not limited to, scales, baggies and spoons;

3.   Books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances and/or firearms;

4.   Telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service; cellular and/or landline telephones; digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association with persons known to traffic in controlled substances or to facilitate such trafficking;

5.   Photographs, in particular photographs of co-conspirators, of assets, and/or of controlled substances;

6.   United States Currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution of crystal methamphetamine, or which are proceeds from the distribution of crystal methamphetamine;

7.   Books, records, receipts, pay stubs, employment records, bank statements and records, money drafts, letters of credit, money order and cashier's checks receipts, passbooks, bank checks and other items evidencing the obtaining, secreting, transfer and/or concealment of assets

and the obtaining, secreting, transfer, concealment and/or expenditure of money;

8.     Papers, tickets, notes, schedules, receipts and other items relating to travel or transportation, including, but not limited to, travel to and from East St. Louis, Illinois, and elsewhere;

9.     Indicia of occupancy, residency, rental and/or ownership of the vehicles and/or premises described above, including, but not limited to, utility and telephone bills, cancelled envelopes, rental or lease agreements and keys; and

10.    Firearms and/or weapons.

11.    Security systems, cameras, cables, recording devices, monitors, and other video surveillance equipment.